USCA1 Opinion

 

 United States Court of Appeals For the First Circuit ____________________ No. 97-1084 UNITED STATES OF AMERICA, Appellant, v. LUI KIN-HONG, a/k/a JERRY LUI, Appellee. ERRATA SHEET ERRATA SHEET The opinion of the court is corrected as follows: On p.10, l.18-19, replace "132 Cong. Rec. S9251 (1986)" with "132 Cong. Rec. 16,819 (1986)" On p.10, n.6, replace "132 Cong. Rec. S9119 (1986)" with "132 Cong. Rec. 16,598 (1986)" On p.11, l.12, replace "143 Cong. Rec. S1846 (1997)" with "143 Cong. Rec. S1846 (daily ed. Mar. 3, 1997)"  United States Court of Appeals For the First Circuit ____________________ No. 97-1084 UNITED STATES OF AMERICA, Appellant, v. LUI KIN-HONG, a/k/a JERRY LUI, Appellee. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Joseph L. Tauro, U.S. District Judge] ___________________ ____________________ Before Boudin, Circuit Judge,  _____________ Aldrich, Senior Circuit Judge,  ____________________ and Lynch, Circuit Judge. _____________ ___________________ Alex Whiting, Assistant United States Attorney, with whom Donald ____________ ______ K. Stern, United States Attorney, and Susan Hanson-Philbrick, _________ _______________________ Assistant United States Attorney were on brief, for the United States. Andrew Good, with whom Harvey A. Silverglate and Silverglate & ____________ ______________________ _____________ Good were on brief, for appellee. ____ Michael Posner and John Reinstein on brief for Lawyer's Committee ______________ ______________ for Human Rights and American Civil Liberties Union of Massachusetts, amici curiae in support of appellee. ____________________ March 20, 1997 ____________________ LYNCH, Circuit Judge. The United States District LYNCH, Circuit Judge _____________ Court granted a writ of habeas corpus to Lui Kin-Hong ("Lui"), who sought the writ after a magistrate judge certified to the Secretary of State that she may, in her discretion, surrender Lui for extradition to the Crown Colony of Hong Kong. The United Kingdom, on behalf of Hong Kong, had sought Lui's extradition on a warrant for his arrest for the crime of bribery. Lui's petition for habeas corpus was premised on the fact that the reversion of Hong Kong to the People's Republic of China will take place on July 1, 1997, and it will be impossible for the Crown Colony to try and to punish Lui before that date. The United States appeals. We reverse the order of the district court granting the writ of habeas corpus. The United States argues that Lui is within the literal terms of the extradition treaties between the United States and the United Kingdom, that the courts may not vary from the language of the treaties, and that the certification must issue. Lui argues that the language of the treaties does not permit extradition, an argument which is surely wrong. Lui's more serious argument is that the Senate, in approving the treaties, did not mean to permit extradition of someone to be tried and punished by a government different from the government which has given its assurances in the treaties.  Lui does not claim that he faces prosecution in Hong Kong on account of his race, religion, nationality, or political opinion. He does not claim to be charged with a political offense. The treaties give the courts a greater role when such considerations are present. Here, Lui's posture is that of one charged with an ordinary crime. His claim is that to surrender him now to Hong Kong is, in effect, to send him to trial and punishment in the People's Republic of China. The Senate, in approving the treaties, could not have intended such a result, he argues, and so the court should interpret the treaties as being inapplicable to his case. Absent a treaty permitting extradition, he argues, he may not be extradited. While Lis it persuasive. The Senate was well aware of the reversion when it approved a supplementary treaty with the United Kingdom in 1986. The Senate could easily have sought language to address the reversion of Hong Kong if it were concerned, but did not do so. The President has recently executed a new treaty with the incoming government of Hong Kong, containing the same guarantees that Lui points to in the earlier treaties, and that treaty has been submitted to the Senate. In addition, governments of our treaty partners often change, sometimes by ballot, sometimes by revolution or other means, and the possibility or even certainty of such change does not itself excuse compliance -4- 4 with the terms of the agreement embodied in the treaties between the countries. Treaties contain reciprocal benefits and obligations. The United States benefits from the treaties at issue and, under their terms, may seek extradition to the date of reversion of those it wants for criminal offenses. Fundamental principles in our American democracy limit the role of courts in certain matters, out of deference to the powers allocated by the Constitution to the President and to the Senate, particularly in the conduct of foreign relations. Those separation of powers principles, well rehearsed in extradition law, preclude us from rewriting the treaties which the President and the Senate have approved. The plain language of the treaties does not support Lui. Under the treaties as written, the courts may not, on the basis of the reversion, avoid certifying to the Secretary of State that Lui may be extradited. The decision whether to surrender Lui, in light of his arguments, is for the Secretary of State to make. This is not to say American courts acting under the writ of habeas corpus, itself guaranteed in the Constitution, have no independent role. There is the ultimate safeguard that extradition proceedings before United States courts comport with the Due Process Clause of the Constitution. On the facg presenting a serious constitutional issue of denial -5- 5 of due process. Some future case may, on facts amounting to a violation of constitutional guarantees, warrant judicial intervention. This case does not. I. We repeat the facts essentially as we stated them in our earlier opinion. United States v. Lui Kin-Hong, 83 _____________ ____________ F.3d 523 (1st Cir. 1996) (reversing district court's decision to release Lui on bail). Lui is charged in Hong Kong with conspiring to receive and receiving over US $3 million in bribes from Giant Island Ltd. ("GIL") or GIL's subsidiary, Wing Wah Company ("WWC"). Lui, formerly a senior officer of the Brown & Williamson Co., was "seconded" in 1990 to its affiliated company, the British American Tobacco Co. (Hong Kong) Ltd. ("BAT-HK"), where he became Director of Exports in 1992. The charges result from an investigation by the Hong Kong Independent Commission Against Corruption ("ICAC"). The Hong Kong authorities charge that GIL and WWC, to which BAT-HK distributed cigarettes, paid bribes in excess of HK $100 million (approximately US $14 to $15 million) to a series of BAT-HK executives, including Lui. The bribes were allegedly given in exchange for a virtual monopoly on the export of certain brands of cigarettes to the People's Republic of China ("PRC") and to Taiwan. Among the cigarettes -6- 6 distributed were the popular Brown & Williamson brands of Kent, Viceroy, and Lucky Strike. GIL purchased three- quarters of a billion dollars in cigarettes from 1991 to 1994, mostly from BAT-HK. A former GIL shareholder, Chui To-Yan ("Chui"), cooperated with the authorities and, it is said, would have provided evidence of Lui's acceptance of bribes. Some of Lui's alleged co-conspirators attempted to dissuade Chui from cooperating. Chui was later abducted, tortured, and murdered. The ICAC claims that the murder was committed to stop Chui from testifying. Lui is not charged in the murder conspiracy. Lui was in the Philippines (which has no extradition treaty with Hong Kong) on a business trip when the Hong Kong authorities unsuccessfully sought to question him in April 1994. Lui has not returned to Hong Kong since then.  At the request of the United Kingdom ("UK"), acting on behalf of Hong Kong, United States marshals arrested Lui as he got off a plane at Boston's Logan Airport on December 20, 1995. The arrest was for the purpose of extraditing Lui to Hong Kong.1 The government asked that Lui be detained pending completion of the extradition proceedings. The  ____________________ 1. The most recent warrant for Lui's arrest from the Hong Kong authorities is dated February 5, 1996; there were earlier warrants. -7- 7 magistrate judge, after a hearing, denied Lui's request to be released on bail. The district court, on April 25, 1996, reversed the order of the magistrate judge and released Lui on bail and conditions. Lui Kin-Hong v. United States, 926 F. Supp. 1180 ____________ _____________ (D. Mass. 1996). The district court held that the reversion of Hong Kong to the PRC on July 1, 1997, raised complex legal issues that would result in protracted proceedings and presented a "special circumstance" overriding the presumption against bail. Id. at 1189. That court also found that there ___ were conditions of release that would adequately ensure Lui's presence at future proceedings. Id. at 1196. This court ___ reversed the district court and, on May 14, 1996, ordered Lui held pending the resolution of the extradition certification issue. Lui, 83 F.3d at 525. ___ The magistrate judge commenced extradition hearings on May 28, 1996. Those proceedings, during which evidence was taken, lasted three days. The magistrate judge found that there was probable cause to believe that Lui had violated Hong Kong law on all but one of the charges in the warrant.2 Magistrate Judge Karol, pursuant to 18 U.S.C.  3184, issued a careful decision certifying Lui's extraditability on August 29, 1996. In re Extradition of Lui ________________________  ____________________ 2. The magistrate judge found the government had not met its burden of showing probable cause as to Count 2, concerning a payment of HK $1,953,260 made on or about October 21, 1988. -8- 8 Kin-Hong ("Lui Extradition"), 939 F. Supp. 934 (D. Mass. ________ _______________ 1996). On September 3, 1996, Lui filed an amended petition for a writ of habeas corpus, the only avenue by which a fugitive sought for extradition (a "relator") may attack the magistrate judge's decision,3 with the district court. After a hearing, the district court issued a memorandum and order granting the writ on January 7, 1997. Lui Kin-Hong v. United States ("Lui Habeas"), --- F. Supp. -- ____________ _____________ __________ -, 1997 WL 37477 (D. Mass. Jan. 7, 1997). The district court reasoned that, because the Crown Colony could not try Lui and punish him before the reversion date, the extradition treaty between the United States and the UK, which is applicable to Hong Kong, prohibited extradition. Id. at ---, ___ *4-*5. Because no extradition treaty between the United States and the new government of Hong Kong has been confirmed by the United States Senate, the district court reasoned, the magistrate judge lacked jurisdiction to certify extraditability. See id. at ---, *5-*11. The district court ___ ___ denied the government's motion for reconsideration on January 13, 1997. This court then stayed the district court's order and expedited the present appeal.   ____________________ 3. Due to the limited function of an extradition proceeding, there is no direct appeal from a judicial officer's certification of extraditability. See Collins v. Miller, 252 ___ _______ ______ U.S. 364, 369-70 (1920). A habeas petition is therefore the only mechanism by which a relator may seek review. -9- 9 At the time Lui was arrested in Boston in December 1995, more than eighteen months remained before the reversion of Hong Kong to the PRC on July 1, 1997. The various proceedings in our court system have now occupied fifteen of those months, as the magistrate judge and district judge have given careful consideration to the issues. II. The extradition request was made pursuant to the Extradition Treaty Between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland, June 8, 1972, 28 U.S.T. 227 (the "Treaty"), as amended by the Supplementary Treaty Between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland, June 25, 1985, T.I.A.S. No. 12050 (the "Supplementary Treaty").4 The original Treaty was made applicable to Hong Kong, among other British territories, by an exchange of diplomatic notes on October 21, 1976. 28 U.S.T. at 238-41.5 The Supplementary Treaty is applicable to  ____________________ 4. We refer to the Treaty and the Supplementary Treaty as "the Treaties." 5. By its terms, the Treaty applies to the UK, and, in addition, to "any territory for the international relations of which the United Kingdom is responsible and to which the Treaty shall have been extended by agreement between the Contracting Parties embodied in an Exchange of Notes."  Treaty, art. II(1)(a).  The Treaty permits either the UK or the United States, upon six months written notice, to terminate the application -10- 10 Hong Kong by its terms. Supplementary Treaty, art. 6(a) & Annex. Hong Kong's status as a Crown Colony is coming to an end on July 1, 1997, when Hong Kong is to be restored to the PRC. The impending reversion, at the expiration of the UK's ninety-nine year leasehold, was formally agreed upon by the UK and the PRC in 1984; the United States was not a party to this agreement. See Joint Declaration of the Government ___ of the United Kingdom of Great Britain and Northern Ireland and the Government of the People's Republic of China on the Question of Hong Kong, Dec. 19, 1984, ratified and entered into force May 27, 1985, T.S. No. 26 (1985) (the "Joint Declaration"). Under the terms of the Joint Declaration, the PRC "declares" its "basic policies" with respect to Hong Kong. Id. art. 3. The PRC states that it intends to ___ establish a "Hong Kong Special Administrative Region" ("HKSAR"), id. art. 3(1), which will enjoy a "high degree of ___ autonomy except in foreign and defence affairs." Id. art. ___ 3(2). In addition, the PRC states that the HKSAR "will be vested with . . . independent judicial power, including that of final adjudication" and that the "laws currently in force in Hong Kong will remain basically unchanged." Id. art. ___  ____________________ of the Treaty as to any territory to which the Treaty was extended under article II(1)(a). Id. art II(2). To date, to ___ our knowledge, neither party has attempted to invoke this provision to terminate the application of the Treaty to Hong Kong. -11- 11 3(3). These "basic policies" are, according to the Joint Declaration, to "remain unchanged for 50 years." Id. art. ___ 3(12). United States Senate ratification of the Supplementary Treaty occurred on July 17, 1986, well after the widely publicized signing of the Joint Declaration. See ___ 132 Cong. Rec. 16,819 (1986). Clearly, the Senate was aware of the planned reversion when it approved the applicability to Hong Kong of the Supplementary Treaty.6 The Supplementary Treaty does not contain an exception for relators who can show that their trial or punishment will occur after the date of reversion. Indeed, the Supplementary Treaty is entirely silent on the question of reversion. The United States does not have an extradition treaty with the PRC. However, on December 20, 1996, the United States signed an extradition treaty with the government of the nascent HKSAR, which provides for reciprocal post-reversion extradition. See Agreement Between ___ the Government of the United States of America and the Government of Hong Kong for the Surrender of Fugitive Offenders, Dec. 20, 1996 (the "New Treaty"). The New Treaty will not enter into force until the Senate gives its advice  ____________________ 6. See, e.g., 132 Cong. Rec. 16,598 (1986) (statement of ___ ____ Sen. Hatch) (commenting on applicability of Supplementary Treaty to Hong Kong). -12- 12 and consent. It was submitted to the Senate on March 3, 1997. See 143 Cong. Rec. S1846 (daily ed. Mar. 3, 1997). ___ A. United States Extradition Procedure  ___________________________________ In the United States, the procedures for extradition are governed by statute. See 18 U.S.C. ch. 209. ___ The statute establishes a two-step procedure which divides responsibility for extradition between a judicial officer7 and the Secretary of State. The judicial officer's duties are set out in 18 U.S.C. 3184. In brief, the judicial officer, upon complaint, issues an arrest warrant for an individual sought for extradition, provided that there is an extradition treaty between the United States and the relevant foreign government and that the crime charged is covered by the treaty. See id. If a warrant issues, the judicial ___ ___ officer then conducts a hearing to determine if "he deems the evidence sufficient to sustain the charge under the provisions of the proper treaty." Id. If the judicial ___ officer makes such a determination, he "shall certify" to the _____ Secretary of State that a warrant for the surrender of the relator "may issue." Id. (emphases added). The judicial ___ ___ officer is also directed to provide the Secretary of State with a copy of the testimony and evidence from the extradition hearing. Id.  ___  ____________________ 7. The judicial officer may be any federal judge, any authorized magistrate, or any state judge of a court of general jurisdiction. See id. 3184. ___ ___ -13- 13 It is then within the Secretary of State's sole  discretion to determine whether or not the relator should actually be extradited. See 18 U.S.C. 3186 ("The Secretary ___ of State may order the person committed under section[] ___ 3184 . . . of this title to be delivered to any authorized agent of such foreign government . . . .") (emphasis added). The Secretary has the authority to review the judicial officer's findings of fact and conclusions of law de novo,8 __ ____ and to reverse the judicial officer's certification of extraditability if she believes that it was made erroneously.9 See 4 Abbell & Ristau, International Judicial ___ ______________________ Assistance: Criminal - Extradition 13-3-8(2), at 266-69 ____________________________________ (1995); Note, Executive Discretion in Extradition, 62 Colum. ____________________________________ L. Rev. 1313, 1316-25 (1962). The Secretary may also decline to surrender the relator on any number of discretionary grounds, including but not limited to, humanitarian and  ____________________ 8. While not required to by statute, the Department of State routinely accepts written submissions from relators in conjunction with its review of extraditability. 4 Abbell & Ristau, International Judicial Assistance: Criminal -- _______________________________________________ Extradition, 13-3-8(5), at 274 (1995). ___________ 9. Although at first glance, this procedure might appear to be of questionable constitutionality because it subjects judicial decisions to executive review, rendering them non- final, cf. Hayburn's Case, 2 U.S. (2 Dall.) 409 (1792), it ___ ______________ has been held that the judicial officer in an extradition proceeding "is not exercising 'any part of the judicial power of the United States,'" and instead is acting in "a non- institutional capacity." United States v. Howard, 996 F.2d _____________ ______ 1320, 1325 (1st Cir. 1993) (quoting In re Kaine, 55 U.S. (14 ___________ How.) 103, 120 (1852)). -14- 14 foreign policy considerations. See 4 Abbell & Ristau, supra, ___ _____ 13-3-8(3), at 269-73; II Bassiouni, International _____________ Extradition: United States Law and Practice 601-04 (1987). _____________________________________________ Additionally, the Secretary may attach conditions to the surrender of the relator. See Jimenez v. United States ___ _______ ______________ District Court, 84 S. Ct. 14, 19 (1963) (Goldberg, J., ______________ chambers opinion) (denial of stay) (describing commitments made by Venezuelan government to United States Department of State as a condition of surrender of fugitive); 4 Abbell & Ristau, supra, 13-3-8(4), at 273-74; II Bassiouni, supra, _____ _____ at 604.10 The State Department alone, and not the judiciary, has the power to attach conditions to an order of extradition. See, e.g., Emami v. United States District ___ ____ _____ _______________________ Court, 834 F.2d 1444, 1453 (9th Cir. 1987); Demjanjuk v. _____ _________ Petrovsky, 776 F.2d 571, 584 (6th Cir. 1985). Of course, the _________ Secretary may also elect to use diplomatic methods to obtain fair treatment for the relator. See, Note, supra, at 1325- ___ _____ 26; cf. In re Normano, 7 F. Supp. 329, 329 (D. Mass. 1934). ___ _____________ Thus, under 18 U.S.C. 3184, the judicial officer's inquiry is limited to a narrow set of issues concerning the existence of a treaty, the offense charged, and the quantum of evidence offered. The larger assessment  ____________________ 10. The United States has, for example, imposed conditions as to the type of trial the relator would receive (e.g., in ____ civil, rather than martial law, court) and as to security arrangements for the relator. 4 Abbell & Ristau, supra,  _____ 13-3-8(4), at 273 n.1.  -15- 15 of extradition and its consequences is committed to the Secretary of State. This bifurcated procedure reflects the fact that extradition proceedings contain legal issues peculiarly suited for judicial resolution, such as questions of the standard of proof, competence of evidence, and treaty construction, yet simultaneously implicate questions of foreign policy, which are better answered by the executive branch. Both institutional competence rationales and our constitutional structure, which places primary responsibility for foreign affairs in the executive branch, see, e.g., ___ ____ United States v. Curtiss-Wright Export Corp., 299 U.S. 304, _____________ ___________________________ 319-22 (1936), support this division of labor.  In implementing this system of split responsibilities for extradition, courts have developed principles which ensure, among other things, that the judicial inquiry does not unnecessarily impinge upon executive prerogative and expertise. For example, the executive branch's construction of a treaty, although not binding upon the courts, is entitled to great weight. Factor ______ v. Laubenheimer, 290 U.S. 276, 295 (1933); cf. United States ____________ ___ _____________ v. Howard, 996 F.2d 1320, 1330 n.6 (1st Cir. 1993) (deference ______ to executive in extradition context stems, at least in part, from fact that executive wrote and negotiated operative documents). Another principle is that extradition treaties, unlike criminal statutes, are to be construed liberally in -16- 16 favor of enforcement because they are "in the interest of justice and friendly international relationships." Factor, ______ 290 U.S. at 298. These principles of construction require courts to: interpret extradition treaties to produce reciprocity between, and expanded rights on behalf of, the signatories: "[Treaties] should be liberally construed so as to effect the apparent intention of the parties to secure equality and reciprocity between them. For that reason, if a treaty fairly admits of two constructions, one restricting the rights which may be claimed under it, and the other enlarging it, the more liberal construction is to be preferred." Howard, 996 F.2d at 1330-31 (quoting Factor, 290 U.S. at 293- ______ ______ 94). Another principle that guides courts in matters concerning extradition is the rule of non-inquiry. More than just a principle of treaty construction, the rule of non- inquiry tightly limits the appropriate scope of judicial analysis in an extradition proceeding. Under the rule of non-inquiry, courts refrain from "investigating the fairness of a requesting nation's justice system," id. at 1329, and ___ from inquiring "into the procedures or treatment which await a surrendered fugitive in the requesting country." Arnbjornsdottir-Mendler v. United States, 721 F.2d 679, 683 _______________________ _____________ (9th Cir. 1983). The rule of non-inquiry, like extradition procedures generally, is shaped by concerns about institutional competence and by notions of separation of -17- 17 powers. See United States v. Smyth, 61 F.3d 711, 714 (9th ___ _____________ _____ Cir. 1995).11 It is not that questions about what awaits the relator in the requesting country are irrelevant to extradition; it is that there is another branch of government, which has both final say and greater discretion in these proceedings, to whom these questions are more properly addressed.12  ____________________ 11. One commentator has analogized the rule of non-inquiry to the "act of state" doctrine, which prohibits United States courts from judging the governmental acts of a foreign country performed within its own territory. See Semmelman, ___ Federal Courts, The Constitution, and The Rule of Non-Inquiry _____________________________________________________________ in International Extradition Proceedings, 76 Cornell L. Rev. ________________________________________ 1198 (1991). The "act of state" doctrine, the Supreme Court has said, "arises out of the basic relationships between branches of government in a system of separation of powers.  It concerns the competency of dissimilar institutions to make and implement particular kinds of decisions in the area of international relations." Banco Nacional de Cuba v. ______________________ Sabbatino, 376 U.S. 398, 423 (1964). This court has doubted, _________ in dicta, that the rule of non-inquiry is constitutionally mandated. Howard, 996 F.2d at 1330 n.6. Whether the ______ doctrine is constitutionally mandated is immaterial here. 12. Nor is it true, as Lui suggests, that the rule of non- inquiry is only appropriate where the existence of a treaty reflects a substantive judgment about the fairness of another nation's procedures. The United States has maintained, over time, extradition treaties with some of the world's most oppressive and arbitrary regimes. See 18 U.S.C. 3181 ___ (listing treaties of extradition and dates entered into).  The rule of non-inquiry expresses no judgment about a foreign __ nation's ability and willingness to provide justice; it simply defers that assessment to the second part of every extradition proceeding -- review of extraditability and determination of the appropriateness of surrender by the Secretary of State. Indeed, a leading commentator, in discussing the scope of the Secretary's discretion under 18 U.S.C. 3186, has argued that it is precisely "because of __________ the rule of non-inquiry" that it is appropriate for the Secretary to exercise discretion on humanitarian grounds. II Bassiouni, supra, at 602 (emphasis added). _____ -18- 18 Lui contends that, on July 1, 1997, the reversion of Hong Kong to the PRC will result in his being subjected to trial and punishment by a regime with which the United States has no extradition treaty. This future event, Lui argues, operates retroactively to render his extradition illegal, as __ of today, because, he says, extradition is only legitimate ________ where trial and punishment will be administered by the regime with which the United States has a treaty.  Although Lui is correct that the government has conceded that he will not be tried before reversion, it is also quite possible that the scenario he depicts will not arise. The new extradition treaty with the HKSAR may be approved by the United States Senate, establishing a continuity of treaties through and beyond July 1, 1997.13 The United States government may choose to extend the current Treaty by executive agreement.14 To the extent that Lui's  ____________________ 13. The government does not argue that, absent any other action and of their own accord, the Treaties would continue beyond reversion to apply to Hong Kong. Accordingly, on the facts of this case, we find the discussion of the state succession doctrine in Terlinden v. Ames, 184 U.S. 270 _________ ____ (1902), a case heavily relied upon by the district court, see ___ Lui Habeas, --- F. Supp. at ---, 1997 WL 37477, at *4-*5, to __________ be of little assistance to Lui. Of course, the discussion in Terlinden of the rule of non-inquiry is relevant, and _________ supports our analysis. 14. It may be argued that this alternative infringes upon the Senate's prerogative, under the Treaty Clause, U.S. Const., art. II, 2, to give its advice and consent. But it is hardly an appropriate judicial task to attempt to resolve a hypothetical and not ripe dispute between the legislature and the executive. -19- 19 argument depends on the fairness of the procedures he will be subjected to, he asks this court to decide that the PRC will not adhere to the Joint Declaration with the UK, in which it declared its intention to maintain Hong Kong's legal system for fifty years. All of these questions involve an evaluation of contingent political events. The Supreme Court has said that the indicia of a non-justiciable political question include:  a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question. Baker v. Carr, 369 U.S. 186, 217 (1962). While not all of _____ ____ these ingredients are present here, several are. Moreover, unlike many "political questions," whose resolution, absent judicial determination, must await the vagaries of the political process, here there is a statutory scheme which provides for the resolution of these questions by an identified member of the executive branch. The case for -20- 20 judicial resolution is thus weaker than with many such questions. The principles of reciprocity and liberal construction also counsel against construing the Treaties so as to prohibit Lui's extradition. Hong Kong, through the United Kingdom, has entered bilateral treaties with the United States. The United States has sought extradition of criminals from Hong Kong in the past, and may wish to continue to do so up until July 1, 1997. If the executive chooses to modify or abrogate the terms of the Treaties that it negotiated, it has ample discretion to do so. However, if this court were to read a cut-off date vis-a-vis extraditions to Hong Kong into the Treaties, it would risk depriving both parties of the benefit of their bargain. None of these principles, including non-inquiry, may be regarded as an absolute. We, like the Second Circuit, "can imagine situations where the relator, upon extradition, would be subject to procedures or punishment so antipathetic to a federal court's sense of decency as to require reexamination of the principle[s]" discussed above. Gallina _______ v. Fraser, 278 F.2d 77, 79 (2d Cir. 1960). This is not such ______ a case. Lui is wanted for economic, not political, activities whose criminality is fully recognized in the United States. His extradition is sought by the current Hong _______ Kong regime, a colony of Great Britain, which, as Lui himself -21- 21 points out, is one of this country's most trusted treaty partners. Moreover, Lui has been a fugitive from Hong Kong since 1994. He has been subject to extradition since entering the United States in December 1995. That now only a few months remain before the reversion of Hong Kong is partly attributable to strategic choices made by Lui himself. There is nothing here which shocks the conscience of this court. B. The Treaties ____________ There is no dispute that the Treaty, as supplemented by the Supplementary Treaty, is currently in effect and is applicable to Hong Kong. The district court, in granting Lui's habeas petition, reasoned that "the Treaty, by its own terms, does not allow the extradition of a person to Hong Kong if the Crown Colony of Hong Kong is unable to try and to punish that person." Lui Habeas, --- F. Supp. at __________ ---, 1997 WL 37477, at *5. The government counters that the terms of the Treaty clearly allow Lui's extradition. There is nothing in the plain language of the Treaties that would permit the construction made by the district court. The principles discussed above argue persuasively against reading judicially created limitations into the Treaties' unambiguous text.  1. Overview ________ We begin our analysis of the Treaties with a brief overview of the Treaties' operative provisions. Article I of -22- 22 the Treaty states the basic reciprocal compact, providing that: Each Contracting Party undertakes to extradite to the other, in the circumstances and subject to the conditions specified in this Treaty, any person found in its territory who has been accused or convicted of any offense within Article III, committed within the jurisdiction of the other Party. Treaty, art. I. Article III contains the "dual criminality" requirement, a requirement that is "central to extradition law and [one that] has been embodied either explicitly or implicitly in all prior extradition treaties between the United States and Great Britain." Brauch v. Raiche, 618 F.2d ______ ______ 843, 847 (1st Cir. 1980). Article III, in relevant part, provides that: Extradition shall be granted for an act or omission the facts of which disclose an offense within any of the descriptions listed in the Schedule annexed to this Treaty . . . or any other offense, if: (a) the offense is punishable under the laws of both Parties by imprisonment or other form of detention for more than one year or by the death penalty . . . . Treaty, art. III(1). The annexed Schedule lists twenty-nine general crimes, including bribery, the crime of which Lui is accused. See Treaty, Schedule, No. 23.  ___ Article V contains various affirmative defenses, including the "political offense" exception. As a general -23- 23 matter, the political offense exception "is now a standard clause in almost all extradition treaties of the world." I Bassiouni, supra, at 384. The political offense exception in _____ the Treaty prohibits extradition where "(i) the offense for which extradition is requested is regarded by the requested Party as one of a political character; or (ii) the person sought proves that the request for his extradition has in fact been made with a view to try or punish him for an offense of a political character." Treaty, art. V(1)(c). The Supplementary Treaty narrows the availability of this political offense exception. It lists a range of crimes -- all crimes of violence -- that may not be regarded as political offenses for the purpose of raising the political offense exception. See Supplementary Treaty, art. ___ 1. The Supplementary Treaty also offers an affirmative defense to fugitives sought for crimes of violence who, by virtue of its article 1, are unable to raise the political offense exception. See Supplementary Treaty, art. 3(a), (b). ___ Such a fugitive may block extradition by establishing: by a preponderance of the evidence that the request for extradition has in fact been made with a view to try or punish him on account of his race, religion, nationality, or political opinions, or that he would, if surrendered, be prejudiced at his trial or punished, detained or restricted in his personal liberty by reason of his race, religion, nationality or political opinions. Id. art. 3(a). ___ -24- 24 The procedural requisites of an extradition request are specified in article VII of the Treaty. The request must be accompanied by, inter alia, a description of the fugitive, _____ ____ a statement of facts of the offense, and the text of the law under which he is charged. See Treaty, art. VII (2). For ___ accused (as opposed to already convicted) fugitives, the request must also include a valid arrest warrant and "such evidence as, according to the law of the requested Party, would justify his committal for trial if the offense had been committed in the territory of the requested Party, including evidence that the person requested is the person to whom the warrant of arrest refers." Id. art. VII(3).15 ___ Article XII contains the "specialty" requirement, a common feature of extradition treaties. Specialty has two basic components. First, the requesting state may not try the fugitive for any crimes other than the specific crime for which extradition was sought and granted. Second, the requesting state may not re-extradite the fugitive to a third state. See Treaty, art. XII.  ___ 2. Analysis ________ Both the district court and Lui focus on four Treaty provisions in concluding that the Treaty is inapplicable to Lui. See Lui Habeas, --- F. Supp. at ---, ___ __________  ____________________ 15. Article IX(1), in turn, states that extradition shall not be granted if the evidentiary showing required by article VII(3) is not made by the requesting party. -25- 25 1997 WL 37477, at *5-*7. We address these provisions in turn, concluding that the obligation of the United States to extradite Lui, specified in article I of the Treaty, is not undermined by any of these provisions. We base our analysis on the plain language of the Treaty. United States v. ______________ Alvarez-Machain, 504 U.S 655, 663 (1992); Sumitomo Shoji Am., _______________ ___________________ Inc. v. Avagliano, 457 U.S. 176, 180 (1982). Underlying this ____ _________ analysis is the court's awareness of the limited role of the judiciary in extradition proceedings.  The Warrant Requirement  _______________________ The district court understood the warrant requirement of article VII(3) to serve the purpose of permitting "the requested sovereign to know that the relator has been accused . . . pursuant to the laws of the requesting sovereign, and that he will be tried and punished in accordance with that sovereign's laws." Lui Habeas, --- F. __________ Supp. at ---, 1997 WL 37477, at *6. In this case, the district court reasoned, since Lui would not be tried in accordance with the present Hong Kong regime's laws, the warrant requirement was not met. Id.  ___ There is nothing in the language of article VII(3), or the rest of article VII, which indicates that the warrant requirement serves the greater function attributed to it by the district court. Indeed, the warrant requirement appears to do nothing more than to help the judicial officer in the -26- 26 requested country to confirm that there are in fact charges properly pending against the relator in the requested country, and that the relator is actually the person sought. It does not authorize the investigation which the district court envisioned, and indeed such an investigation is foreclosed by the rule of non-inquiry. A warrant was provided by the Hong Kong authorities here, and Lui does not attack its validity or authenticity. The warrant requirement was plainly satisfied. The Dual Criminality Requirement  ________________________________ The district court understood the purpose of the dual criminality requirement, as stated in article III of the Treaty, to be "to provide the requested sovereign with the opportunity to examine the substantive law of the requesting sovereign in the context of the Treaty." Lui Habeas, --- F. __________ Supp. at ---, 1997 WL 37477, at *6. The court stated that the requirement serves to "underscore[] the expectation running through the Treaty that [Lui] is to be tried, judged, and punished in accordance with the laws of the requesting sovereign." Id. ___ There is nothing in the text of article III of the Treaty that supports this sweeping conclusion. The dual criminality requirement, by its plain terms, is satisfied if the crime of which the relator is accused appears on the annexed Schedule or is punishable in both countries by at -27- 27 least one year's imprisonment. Bribery, as noted above, appears on the annexed Schedule.  The purpose of the dual criminality requirement is simply to ensure that extradition is granted only for crimes that are regarded as serious in both countries. See United ___ ______ States v. Saccoccia, 58 F.3d 754, 766 (1st Cir. 1995) ("The ______ _________ principle of dual criminality dictates that, as a general rule, an extraditable offense must be a serious crime (rather than a mere peccadillo) punishable under the criminal laws of both the surrendering and the requesting state."); Restatement (Third) of the Foreign Relations Law of the _____________________________________________________________ United States 476, cmt. d (1987); id. 475, cmt. c. _____________ ___ The dual criminality requirement is satisfied here. The Political Offense Exception  _______________________________ The district court also relied on article 3(a) of the Supplementary Treaty, which, it stated, requires the judicial officer "to examine the reasons for the requesting sovereign's desire to try and to punish the relator." Lui ___ Habeas, --- F. Supp. at ---, 1997 WL 37477, at *6. In this ______ case, stated the district court, article 3(a) "underscores again the Treaty's requirement and expectation that extradition . . . may not take place if the requesting sovereign . . . is unable to try and punish Lui in the relatively few days left before its reversion to China." Id. ___ -28- 28 The Supplementary Treaty article 3(a) defense is simply inapplicable here. Supplementary Treaty article 3(a) describes a defense which is available only to fugitives charged with one of the crimes specified in article 1 of the Supplementary Treaty, all of which are crimes of violence. Lui's alleged crime -- bribery -- is not among the crimes enumerated in the Supplementary Treaty's article 1. Indeed, the very purpose of the Supplementary Treaty was to cabin the political offense exception so that perpetrators of certain violent offenses would be precluded from avoiding extradition simply because their criminal activity was inspired by political motivation. See Howard, ___ ______ 996 F.2d at 1324-25. Because this contraction of the time- honored political offense exception stirred up a great deal of controversy during negotiations, a compromise position was ultimately agreed upon, so that fugitives barred from invoking the political offense defense might still claim the protection of the more limited defense of article 3(a). See ___ id. at 1324 (discussing negotiating history and legislative ___ history).  Lui properly does not claim that he is entitled to the article V(1)(c) political offense exception.16 The  ____________________ 16. Even if he had attempted to assert the political offense exception, he would likely have been unsuccessful since "[c]riminal conduct in the nature of financial fraud . . . traditionally has been considered outside the 'political offense' exception." Koskotas v. Roche, 931 F.2d ________ _____ -29- 29 Supplementary Treaty article 3(a) defense was unavailable to him, and thus, however much article 3(a) might ever, as the district court stated, "require[] the court to examine the reasons for the requesting sovereign's desire to try and to punish the relator," Lui Habeas, --- F. Supp. at ---, 1997 WL __________ 37477, at *6, it certainly does not do so here. Moreover, article 3(a) allows the judicial officer to make only a narrowly circumscribed inquiry. "[A]n extradition target must establish by a preponderance of the evidence that, if he were surrendered, the legal system of the requesting country would treat him differently from other similarly situated individuals because of his race, religion, nationality, or political opinions." Howard, 996 F.2d at ______ 1331. Lui made no such showing of discrimination, and the district court, in making its own predictions about the post- reversion justice system in Hong Kong, exceeded the narrow inquiry permitted by article 3(a).  The Rule of Specialty _____________________ The district court understood the Treaty's specialty provision to signify that "the Treaty allows only for extradition for offenses that can be tried and punished by the requesting sovereign." Lui Habeas, --- F. Supp. at -- __________ -, 1997 WL 37477, at *6-*7. Because the specialty obligation cannot be enforced by the United States after reversion,  ____________________ 169, 172 (1st Cir. 1991) (citing cases). -30- 30 reasoned the district court, article XII is violated ab __ initio, and Lui cannot be extradited. Id. at *7. ______ ___ The rule of specialty literally has no application here. The rule has two basic requirements: that the relator be tried for the crimes charged in the extradition warrant and that the relator not be re-extradited to another country. There is no claim that either of these is violated. Indeed, as the district court properly recognized, Lui is not arguing that the reversion itself would constitute a de facto re- extradition from Hong Kong to China in violation of the specialty provision. Lui Habeas, --- F. Supp. at ---, 1997 ___________ WL 37477, at *12 n.15; see also Oen Yin-Choy v. Robinson, 858 ________ ____________ ________ F.2d 1400, 1403-04 (9th Cir. 1988). The essence of Lui's argument is rather different: it is that the fact that he cannot be tried and punished by the same government which gave the Treaty assurances contravenes the rationale behind the specialty provisions and so undermines confidence that this is the result the Senate intended in giving its consent. The responses to that argument are largely those outlined at the beginning of this opinion. We add only our thoughts directed to the specialty clause itself. If Lui's position were correct, the enforceability of many extradition treaties to which the United States is a party would be thrown into grave doubt. Regimes come and go, -31- 31 as, indeed, do states. Moreover, 18 U.S.C. 3184, which defines the role of the courts in the extradition process, gives no discretion to the judicial officer to refuse to certify extraditability on the ground that a treaty partner cannot assure the requested country that rights under a treaty will be enforced or protected. See Saccocia, 58 F.3d ___ ________ at 766-67. The Ninth Circuit, writing in 1988, also rejected a similar argument made by a fugitive who fought extradition by arguing that the United States would be unable to compel Hong Kong's compliance with the specialty obligation because, although he would face trial in the Crown Colony, his imprisonment might extend past the reversion date. "Were the Treaty to be interpreted as [the fugitive] asks, extradition to Hong Kong would be the exception rather than the rule because it would be limited in practice only to extraditions for crimes which could be punished for a term expiring before the reversion date." Oen Yin-Choy, 858 F.2d at 1404. _____________ Indeed, if we interpreted the specialty provision in this way, we would be forced to conclude that any relator extradited from the United States to Hong Kong at any point since the signing of the Joint Declaration, was, if he faced a term of imprisonment upon conviction that could conceivably extend past the date of reversion, sent to Hong Kong in violation of the Treaty. -32- 32 Of course, Lui may express his concerns about the post-reversion enforceability of specialty to the Secretary of State, who, in her discretion, may choose not to surrender him. We note that the newly signed, as yet unratified, extradition treaty between the United States and the HKSAR provides that specialty protection "shall apply to fugitive offenders who have been surrendered between the parties prior to the entry into force" of the new treaty. New Treaty, arts. 16, 20. It is not the role of the judiciary to speculate about the future ability of the United States to enforce treaty obligations. III. Lui also challenges the determination of the magistrate judge that there was probable cause to believe that Lui had violated Hong Kong law on eight of the nine charges in the warrant. Although the district court declined to review this issue, we do reach it. Lui protests that we lack power to reach this issue, and that we must remand to the district court for further findings. However, the issue was fully briefed and argued to the district court. The record is complete. This is a habeas corpus appeal, in which the district court was not the fact finder but had only a review function over the findings made by the magistrate judge. The function to be exercised by the district court is more akin to appellate -33- 33 review, and is done on the same record as is before us. Under these circumstances, the district court had no greater institutional competence to perform this review task than do we. That the district court declined to reach the issue does not deprive us of the power to do so.  While it is true that, as a general matter, federal courts of appeals do not rule on issues not decided in the district court, Singleton v. Wulff, 428 U.S. 106, 120 _________ _____ (1976), we do have discretion to address issues not reached by the district court when the question is essentially legal and the record is complete. Quinn v. Robinson, 783 F.2d 776, _____ ________ 814 (9th Cir. 1986); cf. Howard, 996 F.2d at 1329 ("That the ___ ______ district court failed to afford plenary review on this aspect of the case does not mean that we must remand . . . . Rather, because the question is quintessentially legal and this court is fully capable of deciding it without any further development of the record, we can simply address and resolve it.") (citations omitted). Such is the case here. We have before us the parties' memoranda on probable cause to the district court and the magistrate judge as well as the completed evidentiary record. In the interest of conserving judicial resources and mindful of the policy that extradition matters be handled expeditiously, we see no reason for -34- 34 further delay.17 Cf. Fernandez v. Phillips, 268 U.S. 311, ___ _________ ________ 312 (1925) (Supreme Court reviews probable cause determination of judge certifying extradition without intermediate court passing on the question). The traditional formulation is that, on habeas corpus review of a certification of extraditability, the court only examines the magistrate judge's determination of probable cause to see if there is "any evidence" to support it. Fernandez, 268 U.S. at 312; see also Sidali v. INS, --- _________ ___ ____ ______ ___ F.3d ---, ---, 1997 WL 74506, *9 (3d Cir. 1997); Then v. ____ Melendez, 92 F.3d 851, 854 (9th Cir. 1996). This circuit has ________ interpreted the "any evidence" standard quite literally, conducting a fairly deferential review of the magistrate's findings. See Koskotas v. Roche, 931 F.2d 169, 176 (1st Cir. ___ ________ _____ 1991); United States v. Manzi, 888 F.2d 204, 205 (1st Cir. ______________ _____ 1989); Brauch, 618 F.2d at 854; Greci v. Birknes, 527 F.2d ______ _____ _______ 956 (1st Cir. 1976). Recently, some other appellate courts, while retaining the traditional formulation, have apparently  ____________________ 17. There is no unfairness to Lui. He has had full opportunity to address the issue of whether there is probable cause for extradition before the magistrate judge and full opportunity to address the magistrate judge's determination before the district court. In the extradition proceedings before the magistrate judge, Lui filed a 45 page memorandum on the probable cause issue accompanied by a copious appendix. He also filed motions to exclude certain of the government's evidence, called witnesses, and presented both live testimony and testimony by affidavit. -35- 35 engaged in a more rigorous review of the evidence presented before the judicial officer, thus raising questions about the actual content of the "any evidence" standard. See, e.g., ___ ____ Sidali, --- F.3d at ---, 1997 WL 74506, at *9; Ludecke v. ______ _______ Marshal, 15 F.3d 496, 497-98 (5th Cir. 1994); Peters v. _______ ______ Egnor, 888 F.2d 713, 717-18 (10th Cir. 1989). The Supreme _____ Court last addressed the scope of a court's authority on habeas corpus review of a finding of extraditability in 1925, when it said that "the alleged fugitive from justice has had his hearing" and that "habeas corpus is available only to inquire" into a very limited list of issues. See Fernandez, ___ _________ 268 U.S. at 312. The existence of "any evidence warranting the finding that there was reasonable ground to believe the accused guilty" was one of only three issues that the Fernandez court said might permissibly be reached on habeas. _________ Id. At that time, the scope of habeas corpus review of all ___ ___ proceedings was very limited, and Fernandez's strictures on _________ review in extradition proceedings, including the deferential "any evidence" standard, may simply reflect that generally narrower view of the writ. See In re Extradition of Burt, ___ __________________________ 737 F.2d 1477, 1484 (7th Cir. 1984) ("[T]he broad language of Fernandez, which on its face would appear to restrict the _________ scope of inquiry here, must be construed 'in the context of its time and in the context of subsequent development of the scope of habeas corpus review.'" (citation omitted)). Since -36- 36 1925, and until the enactment of the AEDPA in 1996,18 habeas corpus in other contexts has expanded to become a "second look" at most substantive and procedural issues. Similarly, courts reviewing certifications of extraditability, while continuing to cite Fernandez, have actually engaged in review _________ of issues beyond those enumerated by the Supreme Court in 1925. See Kester, Some Myths of United States Extradition ___ _________________________________________ Law, 76 Geo. L.J. 1441, 1473 (1988); see also 4 Abbell & ___ ___ ____ Ristau, supra, 13-3-6, at 255-57. Thus, it is arguable _____ that the "any evidence" standard is an anachronism, and that this court should engage in a more searching review of the magistrate's probable cause findings. There is no reason to predict a resolution of this issue here. Whatever the prism through which this record is reviewed, ranging from a strictly construed "any evidence" standard to de novo review, our conclusion is that the __ ____ government has met its burden. The purpose of the evidentiary portion of the extradition hearing is to determine whether the United States, on behalf of the requesting government, has produced sufficient evidence to hold the person for trial. The standard of sufficiency is derived from United States law, including the Treaty between the United States and the UK.  ____________________ 18. Antiterrorism and Effective Death Penalty Act ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (1996) -37- 37 Under 18 U.S.C. 3184, the judicial officer must determine whether the evidence of criminality is "sufficient to sustain the charge under the provisions of the proper treaty or convention." The Treaty requires that: Extradition shall be granted only if the evidence be found sufficient according to the law of the requested Party . . . to justify the committal for trial of the person sought if the offense of which he is accused had been committed in the territory of the requested Party . . . . Treaty, art. IX(1). "United States courts have interpreted this provision in similar treaties as requiring a showing by the requesting party that there is probable cause to believe that the accused has committed the charged offense." Quinn, _____ 783 F.2d at 783 (separate opinion of Reinhardt, J.) (citing cases). The Supplementary Treaty defines probable cause: Probable cause means whether there is sufficient evidence to warrant a man of reasonable caution in the belief that . . . an offense has been committed by the accused. Supplementary Treaty, art. 2. The actual trial, if any, is in the foreign court, and it is not the purpose of the extradition hearing to determine whether the evidence is sufficient to justify conviction. Thus it is the probable cause determination which is subject to our review. There is no dispute that payments of over HK $21 million (approximately US $3 million) and unsecured loans of HK $10 million (approximately US $1.4 million) were made to -38- 38 Lui, that the payments were made into foreign bank accounts in Lui's name, and that the payments were not made directly by check but through a series of steps which made them more difficult to trace. There is also no dispute that the payments were made on the dates charged. The timing is significant. The payments coincided with the knowledge that Lui was being considered as Director of Exports for BAT-HK and with his appointment to that position in 1992.19 The loans were made within three days of Lui's leaving his employment at Brown & Williamson and BAT-HK. It is not contested that BAT-HK was the major supplier of cigarettes to GIL and WWC, that Brown & Williamson prohibits its employees from accepting "inducements" from those with whom it does business and requires disclosure statements to be completed, and that Lui failed to disclose any of these payments on his disclosure form. The dispute between the government and Lui is basically over the purpose of these payments. Two competing theories explaining the purpose of the payments were presented to the magistrate judge. The government argued that the payments were bribes. Although Lui had no burden to produce any evidence at all and the burden of showing probable cause rested entirely on the government, Lui did present an explanation for the loans and  ____________________ 19. The one exception to this was the October 1988 payment alleged in Count II, as to which the magistrate judge found a lack of probable cause. -39- 39 payments, primarily in the affidavit of Hung Wing Wah ("Hung"), a former GIL director and sole proprietor of GIL's subsidiary, WWC.20 In essence, Hung said that, in or around 1987, prior to Lui's employment with Brown & Williamson, he and Lui first began discussing "cigarette business matters." Hung stated that these discussions eventually led to the establishment of a profitable business relationship in which Hung purchased Japanese cigarettes and resold them at a profit for the account of Chen Ying-Jen ("Chen"), a former GIL principal. The payments to Lui's foreign bank accounts were filtered through Chen's account. Hung stated he was told by Chen that, because of the substantial profits generated by the business relationship Lui had been instrumental in establishing, Chen had agreed to pay Lui for his assistance and would continue paying Lui as long as the relationship continued to generate such substantial profits. Hung indicated that the sums paid to Lui bore a reasonable relationship to the magnitude of Chen's profits. And finally, Hung stated that the unsecured short term loans had been made to Lui so that Lui could invest in the then-booming Hong Kong stock market. Hung  ____________________ 20. Lui chose not to testify on his own behalf, as was his prerogative. The magistrate judge properly excluded the polygraph evidence offered by Lui to corroborate his testimony. The polygraph evidence was not relevant, there being no such testimony in evidence to corroborate. Whether it would be admissible if he did testify, we do not address. -40- 40 stated that both the principal and interest were repaid shortly after the loans were made. During the hearing before the magistrate judge, Lui's counsel indicated that Lui would testify, and described what that testimony would be. This description matched the testimony given by Hung. Lui ultimately declined to testify. Lui argued that the government's evidence was insufficient to support an inference of bribery and that there was, in any event, an innocent explanation. The government argued that the undisputed facts were sufficient to establish probable cause, and that the explanation was inherently implausible. In addition, the government argued, it had two "smoking gun" statements directly saying the payments were bribes. We return to these two statements and Lui's attack on them later. The magistrate judge concluded that the explanation proffered by Lui's counsel -- "to the effect that the payments represented a gratuitous gesture of gratitude by one of GIL's former principals for Lui's assistance in introducing him to a supplier of Japanese cigarettes in 1987, some six years before the last payments were made" -- was inherently implausible. Lui Extradition, 939 F. Supp. at _______________ 955.21 The implausibility of the explanation does give  ____________________ 21. The statement in the magistrate's opinion that Lui adduced only counsel's argument and not explanatory evidence, Lui Extradition, 939 F. Supp. at 955, is obviously an _______________ -41- 41 credence to the government's theory. See United States v. ___ _____________ Burgos, 94 F.3d 849, 867 (4th Cir. 1996) (implausible tales ______ to the finder of fact can rationally be viewed as circumstantial evidence of guilt). Without consideration of the two "smoking gun" statements, the magistrate judge was fully warranted in finding probable cause. In addition, the two statements, which Lui argues were inadmissible, were properly admitted at the probable cause stage of the extradition hearing and further support a finding of probable cause. The first statement was given to Hong Kong investigators in July 1994 by Chui, one of Lui's alleged co- conspirators. Chui was one of the principals of GIL until April 1993. In his statement, Chui implicated himself and other principals of GIL in a scheme to bribe Lui and others to secure favorable allocations of cigarettes from BAT-HK. According to Chui, GIL began paying bribes to Lui when they first anticipated that Lui might eventually become an important BAT-HK decisionmaker. Chui was murdered in Singapore nine months after giving this statement. The second statement was made by Francis McNamara Haddon-Cave, who worked with Chui. Haddon-Cave testified in Hong Kong in October 1995 at a hearing to determine the  ____________________ oversight. Among other items, the Hung Wing Wah affidavit was admitted into evidence and considered by the magistrate judge. -42- 42 sufficiency of the evidence to commit one of Lui's alleged co-conspirators for trial on a charge of conspiracy to bribe Lui. Haddon-Cave testified that he was hired by Chui to work as a consultant for GIL and began working there in October 1992. One of Haddon-Cave's responsibilities was to foster relationships between GIL and major suppliers like BAT-HK. Haddon-Cave testified that Chui told him in Lui's presence that Lui was "our man" and an important link with GIL. Lui, then BAT-HK's Director of Exports, did not deny it. Haddon- Cave further testified that later, outside of Lui's presence, Chui told him that Lui was "on the take" and had become wealthy as a result of the payments that distributors made to him to secure favorable allocations of cigarettes.  The framework for determining admissibility of evidence here is determined by the Treaty itself and by United States legal rules governing admissibility in extradition proceedings. Pursuant to federal statute, documents offered as evidence in an extradition hearing: shall be received and admitted as evidence . . . for all the purposes of such hearing if they shall be properly and legally authenticated so as to entitle them to be received for similar purposes by the tribunals of the foreign country from which the accused party shall have escaped . . . . -43- 43 18 U.S.C. 3190.22 Proof of such authentication is the certificate of the principal diplomatic or consular officer of the United States resident in such foreign country. Id. ___ Additionally, article VII(5) of the Treaty provides that any evidence given upon oath or affirmation "shall be received in evidence in any proceedings for extradition" if it is duly authenticated. Treaty, art. VII(5). Both the Haddon-Cave testimony and the Chui statement meet this authenticity requirement and were thus admissible at the extradition hearing by the terms of the relevant statute and treaties. Lui argues nonetheless that the two statements were improperly admitted because they would be inadmissible at trial under Hong Kong law. Lui argues that it is inherently unfair to certify that he is extraditable on the basis of evidence that would be inadmissible in the court where he would face trial. He also argues that failure to consider the Hong Kong High Court's declaratory judgment (later reversed) that the Chui statement would be inadmissible would evince great disrespect for the judicial system of Hong Kong. Both of these arguments are misplaced.  ____________________ 22. Lui does not rely on the language of 18 U.S.C. 3190.  Most courts reviewing the language have concluded that 3190 requires only that the evidence meet any authentication requirement imposed by a foreign tribunal, not that it be admissible, much less that it be admissible at trial. See ___ Oen Yin-Choy, 858 F.2d at 1406; Lui Extradition, 939 F. Supp. ____________ _______________ at 934 (citing cases). -44- 44 In probable cause hearings under American law, the evidence taken need not meet the standards for admissibility at trial. Indeed, at a preliminary hearing in federal court a "finding of probable cause may be based upon hearsay in whole or in part." Fed. R. Crim. P. 5.1(a). This is because a "preliminary hearing is not a minitrial of the issue of guilt," Coleman v. Burnett, 477 F.2d 1187, 1201 (D.C. Cir. _______ _______ 1973); rather, "its function is the more limited one of determining whether probable cause exists to hold the accused for trial." Barber v. Page, 390 U.S. 719, 725 (1968). An ______ ____ extradition hearing similarly involves a preliminary examination of the evidence and is not a trial. Charlton v. ________ Kelly, 229 U.S. 447, 461 (1913); Romeo v. Roache, 820 F.2d _____ _____ ______ 540, 544 (1st Cir. 1987). An extradition hearing does not require a higher standard of evidence than a probable cause hearing. The special and limited nature of extradition hearings is manifested in a more lenient standard for admissibility of evidence. Neither the Federal Rules of Criminal Procedure, see Fed. R. Crim. P. 54(b)(5), nor the ___ Federal Rules of Evidence, see Fed. R. Evid. 1101(d)(3), ___ apply to extradition hearings. The evidence may coU.S. 309, 317 (1922). So American domestic law has already resolved against Lui any claim that there is a violation of Constitutional rights from the admission of hearsay evidence -45- 45 at a probable cause hearing which would not be admitted at trial. Under Hong Kong law, the Haddon-Cave statement and the Chui statement present separate and distinct issues. The Haddon-Cave statement was ruled inadmissible at the Hong Kong trial of Chong Tsoi-Jun ("Chong"), an alleged co-conspirator, on an objection that it was not made in furtherance of the conspiracy. As to the Chui statement, a Hong Kong High Court judge issued a declaration that the statement was inadmissible hearsay. On appeal, the Hong Kong Court of Appeal vacated this ruling, finding that Lui's request for a declaratory judgment was not justiciable in the Hong Kong courts, but that even if it were, the judge's grant of the declaration would be an abuse of discretion. The Court of Appeal reasoned that the issue of the admissibility of the Chui statement in the extradition proceeding was a matter for the United States court to decide. The court noted, however, that the parties agreed that the statement was inadmissible hearsay under Hong Kong law. In light of the Hong Kong court's statement that the admissibility of the Chui statement in the extradition hearing is a matter for the United States court to decide, admission of the statement into evidence cannot be viewed as a sign of disrespect for a sister court. -46- 46 The focus on admissibility is, we think, misplaced, both based on these facts and on larger, institutional concerns about the operation of habeas corpus in extradition certifications. While in Manzi we "recognized that serious _____ due process concerns may merit review beyond the narrow scope of inquiry in extradition proceedings," there is no serious due process issue here. See Manzi, 888 F.2d at 206; see also ___ _____ ___ ____ Koskotas, 931 F.2d at 174; cf. Burt, 737 F.2d at 1481; ________ ___ ____ Gallina, 278 F.2d at 78. Lui's liberty interests are _______ protected by the very existence of "an unbiased hearing before an independent judiciary." In re Kaine, 55 U.S. (14 ___________ How.) 103 (1852).  Inherent in the probable cause standard is the necessity of a determination that the evidence is both sufficiently reliable and of sufficient weight to warrant the conclusion. The probable cause standard does not even require that the government make its showing by a preponderance of the evidence. But neither is it toothless. All evidence does not have the same importance even if it is authentic and admissible. For example, a confession obtained by duress is inherently unreliable and would be given little weight even if the confession were authenticated. See Gill ___ ____ v. Imundi, 747 F. Supp. 1028, 1042-47 (S.D.N.Y. 1990). The ______ reliability of the evidence is a factor for the reviewing court to consider as well, and potentially unreliable -47- 47 evidence may be accorded reduced weight by the court. Restatement, supra, 478. ___________ _____ No such concerns about reliability are implicated here. First, the statements themselves were neither involuntary nor obtained under questionable circumstances. Further, the Hong Kong courts did not rule that either statement was untrue or otherwise cast doubt on the statements' credibility. Each statement was thought inadmissible in Hong Kong on grounds pertaining to hearsay. The Haddon-Cave statement was deemed inadmissible because it did not meet one of the requirements for admissibility of a co-conspirator's statement. The Chui statement was thought inadmissible because the declarant was dead. The Hong Kong government alleges that Chui was involved in the conspiracy until he became a government informant and witness and that he was murdered in order to prevent him from testifying. GIL directors, including Hung and Chong, allegedly tried to dissuade Chui from cooperating with the ICAC. We need not reach the issue of whether the statement of a declarant, murdered to keep him from testifying, might be admissible at a criminal trial in the United States, cf. United States v. ___ ______________ Houlihan, 92 F.3d 1271 (1st Cir. 1996), whatever the ________ consequence of these facts under Hong Kong law. Nevertheless, we note that the Chui statement might well be admissible under United States law as a statement against -48- 48 interest. See Fed. R. Evid. 804(b)(3). The magistrate judge ___ correctly ruled that the two statements were not unreliable. One final argument need not detain us long. Lui argues, from his counsel's tactical decision not to present his testimony at the extradition hearing, that he was precluded from testifying. He argues that the magistrate judge drew an unfavorable inference, in violation of his Fifth Amendment rights, from his failure to testify. The argument misapprehends what happened. The magistrate judge did no such thing. Lui presented testimony from Hung and five other affiants, as well as argument of counsel attempting to explain the payments and loans. The magistrate judge disbelieved the explanation, as it was within his discretion to do. There is nothing in this objection. For these reasons we reverse the grant of habeas corpus by the district court. We continue in effect the requirement that Lui be held without bail. If Lui wishes to file a petition for rehearing and/or a petition for rehearing en banc with this court, he must do so within 14 calendar days. See Fed. R. App. P. 40(a) & 35(c). We stay, in any ___ event, delivery of the certification of extraditability to the Secretary of State during this 14 calendar day period to permit Lui to seek relief from the United States Supreme Court. So ordered. -49- 49